United States District Court
Southern District of Texas
**ENTERED**
May 26, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| Donald Woods, Individually, and on behalf of the Estate of Danny Ray Thomas; Marketta Chanta Thomas, Individually, and on behalf of the Estate of Danny Thomas; Adenike Raynell Thomas, Individually and on behalf of the Estate of Danny Ray Thomas; Naisha Bell, as Next Friend of M.K. Thomas; Diane Turner, as Next Friend of B.D. Turner; Necole West, as Next Friend of D.R. Thomas (12); Denise Matthews, as Next Friend of D.R. Thomas (3); Ronshell Hampton, as Next Friend of L.N. Hampton, | § § § § § § § § § § § § § § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. 4:18-cv-1152 |
| v. | § § | |
| Harris County, Texas, and Cameron Brewer, | § § § | |
| *Defendants.* | § § | |

## MEMORANDUM AND RECOMMENDATION

Danny Ray Thomas, an unarmed black man, was tragically shot and killed by a police officer at an intersection in North Houston. That officer, Deputy Cameron Brewer, who is also black, saw Mr. Thomas acting erratically

1

and concluded that Thomas was suffering from a condition called "excited delirium."  When Mr. Thomas disobeyed Deputy Brewer's orders to lie down and instead continued to approach him, Brewer decided to employ deadly force instead of utilizing other means to control the situation.

After Mr. Thomas's death, his family ("Plaintiffs") asserted claims under 42 U.S.C. § 1983 against Deputy Brewer and his employer, Harris County (the "County"), and a claim against the County under the Americans with Disabilities Act.  The County and Deputy Brewer filed separate motions for summary judgment, to which Plaintiffs filed separate responses.  *See* Dkt. 66 (County's MSJ); Dkt. 76 (County's Amended MSJ); Dkt. 87 (Plaintiffs' response); Dkt. 71 (Brewer's MSJ); Dkt. 86 (Plaintiffs' response).  Only the County filed a reply brief.  Dkt. 91.  The County and Plaintiffs objected to certain summary judgment evidence.  Dkt. 88 (Plaintiffs' objection); Dkt. 89 (Plaintiffs' amended objections); Dkt. 92 (County's response); Dkt. 93 (County's motion to strike); Dkt. 95 (Plaintiffs' response); Dkt. 97 (County's reply).  All these motions were referred to the undersigned.  Dkts. 98, 99.

The Court has carefully considered the parties' briefing as well as their presentations at oral argument.  Given the high threshold for substantiating Plaintiffs' claims, and despite reviewing the evidence in the light most favorable to Plaintiffs, the Court hereby recommends that the Court grant both

Deputy Brewer's and the County's motions for summary judgment and deny the parties' evidentiary challenges as moot.

## Factual Background and Procedural History

Most of the incident—except the seconds leading up to and including the shooting—was captured on video.  On March 18, 2018, at about 12:50 p.m., Deputy Brewer was driving south on Imperial Valley Lane while proceeding to his assigned beat.  Dkt. 86-7 (dashboard camera footage); Dkt. 86-8 at 20, 24 (Internal Affairs Division report).  When approaching the intersection with Greens Road, he stopped at a red light.  Dkt. 86-7.  There, he noticed a man standing in the middle of traffic on the cross street.  Dkt. 86-8 at 20.  Deputy Brewer described that man, later identified as Danny Ray Thomas, as approximately 5' 9" to 6' 0" tall, "slim to medium build," with his pants "pulled down to his ankles exposing his boxer shorts."[1]  *Id.*  While traffic was flowing along the cross street, a white car passing through the intersection stopped abruptly when nearing Mr. Thomas.  Dkt. 86-7.  Mr. Thomas banged his hands on the car's hood, prompting the driver to get out and confront him.  Dkt. 86-7; Dkt. 86-8 at 20.  Deputy Brewer paused before pulling forward into the intersection, just short of the white car.  Dkt. 86-7.

---

[1] Deputy Brewer, who is 6' 3" and weighs 325 pounds, indicated that he was "larger" than Thomas.  Dkt. 86-8 at 24.  Yet the autopsy report notes that Mr. Thomas is 6' 5" and weighs 177 pounds.  Dkt. 86-15 at 2.  There is no explanation for this discrepancy.

Mr. Thomas approached the driver, who shoved Thomas in the chest, causing him to stumble backward several steps.  *Id.*  At that moment, Deputy Brewer, who had exited his patrol car, began yelling "Hey" at Mr. Thomas, ordering him to "get on the ground!"  *Id.*  Mr. Thomas saw Deputy Brewer, turned, pointed at him, and started advancing toward him.  *Id.*  Both the driver and his female passenger began returning to their vehicle.  *Id.*; Dkt. 86-6 (witness cell phone footage).

It is not clear when Deputy Brewer unholstered his weapon.  Undisputed evidence does, however, reflect that despite having a County-issued taser, Dkt. 86-12 at 45, Deputy Brewer decided to draw his service weapon and point it at Mr. Thomas, Dkt. 86-8 at 20.  Deputy Brewer continued shouting as Mr. Thomas approached him, telling him to get down at least ten times.  Dkt. 86-7.  At one point, Deputy Brewer shouted, "I'll shoot your ass!"  *Id.*  Mr. Thomas ignored those commands and continued advancing toward Deputy Brewer, out of view of the police dashboard camera.  *Id.*

Bystanders noticed the developing situation.  Kaaryn Young, who was standing across the road, filmed the incident on her cell phone.  Dkt. 86-6.  Ms. Young's video shows Deputy Brewer walking backward into the intersection as Mr. Thomas advanced; Brewer then circled the other way, toward his vehicle, while trying to maintain some distance between himself and Mr. Thomas.  *Id.*  Mr. Thomas continued to walk silently toward Deputy Brewer.  *Id.*

At this point, a truck drove in front of Ms. Young, obscuring her view. *Id.* For approximately five seconds, her camera was unable to capture what was happening in the intersection. *Id.* During this period, Deputy Brewer contends that Mr. Thomas continued advancing on him, leading Deputy Brewer to fire his gun. Dkt. 86-8 at 20. The bullet struck Mr. Thomas in the lower chest area, killing him. Dkt. 86-7, 86-15 at 1.

Only sixteen seconds had elapsed from the time that Mr. Thomas pointed at Deputy Brewer until the moment of the shot. Dkt. 86-7 (39 sec. to 55 sec). A subsequent autopsy concluded that Mr. Thomas had Phencyclidine (PCP) and substances associated with Marijuana in his system. Dkt. 86-15 at 11.

The Harris County Police Department Internal Affairs Division investigated the shooting. Deputy Brewer claimed that Mr. Thomas came within "striking distance" of him, which in his deposition he described as within four feet. Dkt. 86-8 at 21, 23; 86-12 at 131. Deputy Brewer believed that Mr. Thomas was experiencing "excited delirium," a condition in which people can exhibit "extraordinary strength." Dkt. 86-8 at 20. Deputy Brewer stated that he was afraid for his life, and that he shot Mr. Thomas to protect himself. *Id.* But the County concluded that Deputy Brewer had violated its use-of-force policies and terminated his employment. Dkt. 86-14 at 1.

Plaintiffs filed suit against Deputy Brewer and the County, alleging violations of 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA").

Dkt. 19.   Deputy Brewer moved for summary judgment, invoking qualified immunity.   Dkt. 71.   The County also moved for summary judgment on Plaintiffs' claims against it.   Dkt. 76.

## Legal Standard

Under Federal Rule of Civil Procedure 56, a court must grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"   *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   A fact is material if the issue that it tends to resolve "could affect the outcome of the action."   *Dyer v. Houston*, 964 F.3d 374, 379-80 (5th Cir. 2020) (citing *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)).   When resolving a motion for summary judgment, the court must view the facts and any reasonable inferences "in the light most favorable to the nonmoving party."   *See Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010) (internal quotation marks omitted).

## Analysis

### I.   Deputy Brewer is entitled to qualified immunity because his actions did not violate Mr. Thomas's clearly established rights.

When a public official invokes qualified immunity, the plaintiff bears the burden to rebut that defense "by establishing a genuine fact issue as to whether the [officers'] allegedly wrongful conduct violated clearly established law." *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2014) (internal quotation marks omitted; modification in original).   To meet this burden, a plaintiff must demonstrate two things.   First, the plaintiff must show that the actions taken by the officer violated a constitutional right.   *See Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003).   Second, the plaintiff must show that the right in question was clearly established at the time of the alleged harm.   *Id.* at 624.

Courts can analyze the two prongs of the qualified immunity test in any order.   *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).   If the law is not clearly established, then the court can skip the first step and move directly to the second step.   *Id.*   But addressing both steps in order "is often beneficial." *Id.*   Given the underlying facts and the recent authority addressing qualified immunity in the excessive-force context, this case merits examining both steps.

**A.   Plaintiffs have raised a genuine issue of material fact that Deputy Brewer's use of force was objectively unreasonable.**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Excessive force claims comprise a subset of Fourth Amendment seizures.  *See, e.g.*, *Mace*, 333 F.3d at 624.  To establish a claim of excessive force, plaintiffs must demonstrate: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).  As a subcategory of excessive force claims, the use of deadly force is subject to specific limitations.  Police officers may employ deadly force only when necessary to prevent "a threat of serious physical harm, either to the officer or to others ...." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

**1.   Using deadly force on an unarmed person who poses no imminent threat of death or serious bodily harm is objectively unreasonable.**

When analyzing deadly force cases, courts are guided by three factors articulated in *Graham v. Connor*, 490 U.S. 386, 396 (1989).  First, the court considers the severity of the crime at issue.  *Id.*  Second, the court examines whether the suspect poses an immediate threat to the safety of the officers or

others.  *Id.*  Third, the court analyzes whether the target of deadly force is actively resisting arrest or attempting to evade arrest by flight.  *Id.*  All factors are considered from the perspective of a reasonable officer at the scene, without employing "the 20/20 vision of hindsight."  *Id.*

Post-*Graham*, courts have focused on a suspect's threatening actions that suggest an intent to inflict death or serious bodily harm.  In those instances, the Fifth Circuit routinely holds that the use of deadly force is objectively reasonable.  *See, e.g.*, *Clayton v. Columbia Cas. Co.*, 547 F. App'x 645, 653 (5th Cir. 2013) (suspect advancing aggressively, allegedly holding a knife); *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009) (suspect reaching as if for a weapon); *Ramirez v. Knoulton*, 542 F.3d 124, 131 (5th Cir. 2008) (suspect raising a firearm as if to shoot).  Conversely, the absence of any threatening gesture by a suspect often leads to a denial of qualified immunity.  *See, e.g.*, *Sanchez v. Fraley*, 376 F. Appx 449, 451-52 (5th Cir. 2010) (suspect's hands at side when police shot him); *Graves v. Zachary*, 277 F. App'x 344, 346 (5th Cir. 2008) (suspect never threatened, pointed weapon, or moved aggressively).

Where the suspects were unarmed, however, the Fifth Circuit has been more skeptical of officers who employed deadly force.  For example, in *Newman v. Guedry*, the Fifth Circuit reversed a grant of qualified immunity to an officer who beat a suspect with a nightstick thirteen times and then tasered him three

times even though he obeyed commands, committed no crime, and posed no threat to anyone's safety.  703 F.3d 757, 759-60 (5th Cir. 2012).  The Court found it dispositive that the officers immediately resorted to taser and nightstick before attempting to employ "physical skill, negotiation, or even commands."  *Id.* at 763; *see also Deville*, 567 F.3d at 167 (reversing summary judgment for police officer who broke the window to suspect's car, dragged her from it, and then slammed her against it).  In another case, the Fifth Circuit concluded that an officer's physical altercation with a suspect did not justify deadly force when the two were separated for multiple seconds.  *See Hobart v. Estrada*, 582 F. App'x 348, 355 (5th Cir. 2014).

Even when confronting suspects who possessed weapons, the Fifth Circuit has rejected police use of deadly force unless those suspects presented an imminent threat of death or serious harm.  This includes fleeing motorists, *Lytle v. Bexar Cnty.*, 560 F.3d 404, 416-17 (5th Cir. 2009), suspects with guns, *Graves*, 277 F. App'x at 348 ("Merely having a gun in one's hand does not mean per se that one is dangerous."), and suspects who have tussled with the officer, *Hobart*, 582 F. App'x at 355.

At bottom, the appropriate inquiry is whether a reasonable officer, under the totality of the circumstances, would perceive the danger as an *immediate* threat of serious bodily harm that justified using deadly force *at the moment of the shooting*.  *Thompson v. Mercer*, 762 F.3d 433, 440 (5th Cir. 2014).  Unless

the threat is both imminent and serious, deadly force is objectively unreasonable.

### 2. A reasonable jury could conclude that Deputy Brewer's use of force was objectively unreasonable.

Applying the *Graham* factors, a reasonable jury could find that Deputy Brewer unreasonably used deadly force. The first factor, the severity of the crime at issue, weighs heavily against Deputy Brewer. As Deputy Brewer admitted, he suspected Mr. Thomas—at most—of committing a misdemeanor by impeding the flow of traffic. Dkt. 86-12 at 123. This offense carries a maximum punishment of 180 days in jail. *See* Tex. Penal Code Ann. §§ 12.22, 42.03 (2021). Deputy Brewer also had not been called to the scene and had no prior indications that Mr. Thomas was becoming violent. Dkt. 86-7.

The second *Graham* factor, whether the suspect posed an immediate and serious threat, is a closer call but still weighs against Deputy Brewer. Most obviously, Mr. Thomas was unarmed. Mr. Thomas's blank stare, his pants around his ankles, the white crust around his mouth, and his odd behavior suggested that he was suffering from an altered mental state. Yet Mr. Thomas never put his hands on anyone around him. He made no verbal threats, nor did he indicate that he was about to attack, despite moving toward Deputy Brewer. Dkt. 86-6. Moreover, Mr. Thomas was still four feet away, hobbled by his pants and swinging his arms while walking, when Deputy Brewer shot

him.  Dkt. 86-12 at 131.  The evidence does not suggest that deadly force was necessary to avert imminent and serious bodily harm.

This conclusion is bolstered by the fact that Mr. Thomas never performed a sudden threatening act.  Mr. Thomas did not lunge at Deputy Brewer or reach for Deputy Brewer's weapon.  Dkt. 86-12 at 136.  Unlike in *Manis* and *Ramirez,* Mr. Thomas walked toward Brewer, arms by his sides, at a moderate pace.  *Compare Manis*, 585 F.3d at 844 (reached as if for a weapon), *and Ramirez*, 542 F.3d at 131 (moved as if to point pistol), *with* Dkt. 86-6; 86-7 (walked forward at same rate).  Mr. Thomas was not rushing or sprinting—nor could he, given that his pants were around his ankles.  *Id.*

The final *Graham* factor, whether the suspect actively resisted arrest or was fleeing, weighs slightly in Deputy Brewer's favor.  Although Mr. Thomas did not flee, he ignored Deputy Brewer's commands and continued to approach. *See Clayton,* 547 F. App'x at 653 (suspect's noncompliance informed whether the officer reasonably believed that suspect posed a threat).  But this factor does not merit significant weight.  Mr. Thomas did not shout at Deputy Brewer. *See id.* at 647-48 (describing suspect's aggressive shouting and walking).  There was no physical contact between Deputy Brewer and Mr. Thomas either.  Yet Deputy Brewer never attempted to subdue Mr. Thomas, an unarmed man, through less lethal means before resorting to pulling his firearm.  *See, e.g.*, *Newman*, 703 F.3d at 763 (use of force was unjustified when officer did not

12

attempt to use "physical skill, negotiation, or even commands" before using a taser and nightstick).  Indeed, Deputy Brewer had a County-issued taser that is considered "the best method" for dealing with someone who potentially is experiencing drug-induced delirium.  Dkt. 86-8 at 10.  And even physical resistance to arrest does not alone justify using deadly force against an unarmed person, particularly when that person remains several feet away.  *See Hobart*, 582 F. App'x at 355 (affirming denial of qualified immunity despite plaintiff's physical resistance to arrest).

Weighing all three *Graham* factors, a reasonable jury could find that Deputy Brewer's use of force was objectively unreasonable.

### 3.   Deputy Brewer's subjective beliefs did not justify his use of deadly force.

Deputy Brewer contends that his actions were justified because he reasonably concluded that Mr. Thomas presented a mortal danger.  Dkt. 71 at 4.  According to Deputy Brewer, his training and experience led him to believe that Mr. Thomas was suffering from excited delirium, a drug-induced condition that gives a person "supernatural strength, everlasting endurance ... [and] unlimited [pain tolerance]."  Dkt. 86-12 at 67-68.  Deputy Brewer described a prior occasion when he and three other officers struggled to subdue a man experiencing excited delirium, despite tasing him over ten times.  Dkt. 86-8 at 23; Dkt. 86-12 at 74-82.  Based on that single encounter, Deputy Brewer chose

to pull his gun instead of his taser because he thought that Mr. Thomas had the same condition as the prior suspect.  Dkt. 71 at 10.

But a reasonable officer faced with the same situation readily could have concluded that Mr. Thomas was *not* experiencing excited delirium.  Deputy Brewer learned the key symptoms of that condition during a four-hour training course.  Dkt. 86-8 at 10.  Those symptoms include "bizarre and/or aggressive behavior, shouting, paranoia, panic, violence toward others, unexpected physical strength, and hyperthermia."  *Id.*  As the video reflects, Mr. Thomas exhibited a few of these symptoms, but not others.  Although he acted bizarrely, striking a car with his hands and wandering with his pants around his ankles, he did not say a word, much less shout.  Dkt. 86-7.  And far from demonstrating "unexpected physical strength," Mr. Thomas stumbled backward several feet after a driver shoved him in the chest.  Dkt. 87-6.  Notably, too, Mr. Thomas did not retaliate against the driver despite being pushed, thereby suggesting a lack of violent tendencies.  *Id.*  Ample evidence supports that Deputy Brewer leapt to an unwarranted and unreasonable conclusion.[2]

---

[2] At a hearing, counsel for Deputy Brewer described Mr. Thomas as being "high on drugs."  *See* Oral Argument at 10:12:00.  Although the autopsy report found Phencyclidine (PCP) in Mr. Thomas's system, Dkt. 87-14 at 11, the parties presented no evidence showing how the amount detected would have affected Mr. Thomas's behavior or his awareness of events around him.

More fundamentally, the controlling analysis does not ask "whether the force was justified based on [Deputy Brewer's] claimed interpretation of the situation at the time." *Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005) (citing *Stroke v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994)).  This is because the Supreme Court forbids considering an officer's subjective beliefs when determining what a reasonable officer would have done. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("[S]ubjective beliefs ... are irrelevant."). Deputy Brewer's subjective experience dealing with a person in a state of excited delirium may have led Brewer to assume—contrary to other key indications—that Mr. Thomas possessed superhuman strength and endurance.  But that does not render his assumption reasonable. *See Hobart*, 582 F. App'x at 355 ("[R]egardless of whether an officer's mental state caused him to panic such that he unreasonably determined that a threat was present, that would not render his determination reasonable.").

Even assuming that Mr. Thomas had possessed "superhuman strength," Dkt. 86-8 at 22, that still would not give Deputy Brewer an automatic license to shoot him.  In *Lytle*, for instance, the Fifth Circuit held that police officers improperly used deadly force against a fleeing motorist—with a potentially deadly weapon—when the driver posed no imminent threat of serious bodily harm.  560 F.3d at 407-08, 416-17 (officer shot twice at fleeing motorist who had stopped after colliding with another vehicle).  Thus, in the face of other

15

facts, Deputy Brewer's belief that Mr. Thomas's altered state made him tantamount to a weapon did not make it reasonable to employ deadly force. *See Graves*, 277 F. App'x at 348 (possessing a gun does not necessarily make a suspect dangerous).   Mr. Thomas's movement was impaired by the pants around his ankles, his hands remained around his sides, and he remained a few feet away from Deputy Brewer.   Viewing the evidence in a light most favorable to Plaintiffs, a reasonable jury could conclude that Mr. Thomas posed no imminent threat of serious harm when Deputy Brewer shot him.   Dkt. 86-6; 86-7.

### B.  Plaintiffs fail to show that the constitutional right at issue is clearly established as a matter of law.

Determining if Deputy Brewer used excessive force is only the first step in the qualified immunity analysis, however.   A public official who violates an individual's constitutional rights is still immune from liability unless the rights in question were "clearly established" when the violation occurred.   *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

There are three avenues for showing that a right is clearly established. First, an on-point, controlling case can put the constitutional violation "beyond debate."   *See, e.g.*, *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam).   Second, a "robust consensus of persuasive authority" can clearly define the contours of a constitutional right.   *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Finally, there may be circumstances where neither controlling authority nor a robust consensus of persuasive authority exists, but the constitutional violation is nonetheless "obvious." *See Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)). Given the strictness of these standards, the Court cannot conclude that Plaintiffs have met their burden.

### 1. No binding authority squarely governs the constitutional right at issue.

Plaintiffs' brief primarily invokes four decisions to show that Deputy Brewer violated clearly established law. Dkt. 86 at 15-20. Because those decisions are not binding, they cannot clearly establish a Fourth Amendment violation here.

The first—*Hobart,* 582 F. App'x at 355—is unreported. The Fifth Circuit has held that unreported decisions cannot clearly establish a right. *See Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019) ("Because nonprecedential opinions do not establish any binding law for the circuit, they cannot be the source of clearly established law for qualified immunity analysis."). Plaintiffs' three other authorities are equally inapposite; they are district court decisions that do not bind any court. *See* Dkt. 86 at 18-20; *see Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial

17

district, or even upon the same judge in a different case.") (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1][d], p. 134-26 (3d ed. 2011)).

The remaining cited cases, while informative, are not sufficiently analogous to constitute "clearly established" law. Overcoming qualified immunity requires showing that "every reasonable official would understand that what he is doing violates [a constitutional right]." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (internal quotation marks omitted). This standard demands great factual particularity, especially for Fourth Amendment claims. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (noting that courts must analyze Fourth Amendment rights with a higher degree of specificity than other rights).

The Supreme Court has admonished courts "not to define clearly established law at a high level of generality." *Mullenix*, 577 U.S. at 12. Although the standard "does not require a case directly on point for a right to be clearly established," *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7-8 (2021) (per curiam), the Court nonetheless has reversed decisions that framed the inquiry without sufficient factual specificity, *see id.* at 8; *Mullenix*, 577 U.S. at 16-17; *Ashcroft*, 563 U.S. at 741 (rejecting Ninth Circuit's conclusion that the "history and purposes of the Fourth Amendment" clearly established a right).

In *Mullenix*, the Court reversed a Fifth Circuit decision that articulated the relevant right as a prohibition against using "deadly force against a fleeing

18

felon who does not pose a sufficient threat of harm to the officer or others." 577 U.S. at at 12 (internal quotation marks omitted). The Supreme Court emphasized that, to constitute a violation of clearly established law, existing precedent must "place[] the conclusion that [the officer] acted unreasonably *in these circumstances* beyond debate." *Id.* at 14 (emphasis added; internal quotation marks omitted). Those circumstances involved a "reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering [another] officer ...." *Id.* at 13.

Just last year, the Court reaffirmed the demanding nature of this standard. In *City of Tahlequah v. Bond*, the Court rejected the Tenth Circuit's denial of qualified immunity for an officer who shot a man who raised a hammer "and took a stance as if he was about to throw it or charge at the officers." 142 S. Ct. 9, 11-12 (2021) (per curiam). The Court found it dispositive that the police had been negotiating calmly with the suspect until he raised a weapon, as opposed to other Tenth Circuit cases where the officer had charged at and assaulted the suspect. *Id.* at 12. Similarly, in *Rivas-Villegas v. Cortesluna*, the Court detailed several facts distinguishing the case from prior Ninth Circuit precedent. 142 S. Ct. at 8 (distinguishing *LaLonde v. County of Riverside*, 204 F. 3d 947 (9th Cir. 2000)). Whereas Cortesluna had a weapon,

the suspect in *LaLonde* did not, and Cortesluna was accused of domestic violence, while the *LaLonde* case involved a noise complaint. *Id.* at 8-9.

Applying the Supreme Court's standard, Plaintiffs' authorities lack sufficient factual parallels to this case. The Court agrees with Deputy Brewer that an analogous case must at least hold that deadly force cannot be used against (1) an unarmed victim; (2) who was advancing on the officer; and (3) who was disobeying the officer's commands. Oral Argument at 10:17:15. To constitute clearly established law governing these facts, any relevant authority also must account for the suspect's altered mental state.

The decision in *Bazan ex rel Bazan v. Hidalgo County*, did involve an unarmed individual who was under the influence of drugs or alcohol, fought with the officer (at least initially), and disobeyed the officer's commands. 246 F.3d 481, 483 (5th Cir. 2001). But *Bazan* addressed a materially different context. There, the officer had approached a motorist whose car had skidded into a ditch. *Id.* After some questioning, the officer and the suspect engaged in a physical struggle. *Id.* at 483-84. Thereafter, the officer chased Mr. Bazan into a field, out of sight from the third-party witnesses. *Id.* at 484. In that field, the officer shot Mr. Bazan, killing him. *Id.* at 486. The Fifth Circuit emphasized that the only account of what happened in the field came from the officer—an interested party. *Id.* at 493. The witnesses also disputed the officer's description of what transpired before Mr. Bazan fled for the field. *Id.*

20

at 484-85.  On that record, a reasonable jury could disbelieve the officer's story and conclude that Mr. Bazan had *not* failed to comply with the officer's commands, but instead continued to flee without posing an immediate threat that justified use of deadly force.  Those factual disputes foreclosed summary judgment on qualified immunity.

Here, in contrast, video evidence documents the entire encounter between Deputy Brewer and Mr. Thomas except for the few seconds before the shooting.  Dkt. 86-6; Dkt. 86-7.  Unlike in *Bazan*, that video conclusively establishes that Mr. Thomas behaved erratically and continued advancing toward Deputy Brewer despite repeated commands to stop.  Plaintiffs also do not dispute the material facts even for the few seconds not captured by the video.  They do not contest that Mr. Thomas continued advancing on Deputy Brewer, that he had white foam around his mouth, that his eyes were bloodshot, and that he got within four feet of Deputy Brewer before the shot was fired.[3]  *Bazan* does not supply clearly established law prohibiting Deputy Brewer's conduct here.

The Fifth Circuit's en banc decision in *Cole v. Carson*, which Plaintiffs mention in passing, Dkt. 86 at 16 n.96, cannot show that Deputy Brewer's

---

[3] Deputy Brewer asserts that Mr. Thomas moved "quickly."  Dkt. 86-8 at 21.  The video suggests otherwise.  Dkt. 86-6; Dkt. 86-7.  In any event, Brewer's characterization does not control, given the summary judgment standard.

conduct violated clearly established law. 935 F.3d 444 (2019) (en banc). That opinion was issued more than a year after the incident here. *See id.* Authorities post-dating an incident cannot provide advance notice of what the Fourth Amendment requires. *See Ashcroft*, 563 U.S. at 741 (limiting the analysis to cases decided "at the time" of the challenged conduct).

Despite exhaustive additional research, the Court has found no Fifth Circuit or Supreme Court case concluding that an officer unconstitutionally used deadly force under factually similar circumstances. As a result, no controlling precedent clearly establishes that Deputy Brewer's conduct violated the Fourth Amendment.

### 2. Plaintiffs have not identified a robust consensus of persuasive authority clearly establishing a constitutional violation.

Plaintiffs have suggested—although not in their briefing—that a robust consensus of persuasive authority clearly establishes a right that Deputy Brewer violated. Oral Argument at 10:19:20. According to Plaintiffs, cases in the Fifth Circuit, coupled with persuasive cases from other courts, reflect the general principle that an officer cannot use deadly force against an unarmed man who advances on the officer. *See* Oral Argument at 10:34:40-10:37:15.

Neither the Fifth Circuit, nor the Supreme Court, has ever found that a constitutional right exists based on a robust consensus of persuasive authority. Although some Fifth Circuit cases have mentioned the standard, few have

22

meaningfully analyzed it, and none have articulated what constitutes a "robust consensus." *See, e.g.*, *Wyatt v. Fletcher*, 718 F.3d 496, 508-09 (5th Cir. 2013) (noting the standard but rejecting plaintiff's reliance on a single out-of-circuit case). Other circuit decisions applying the standard do not provide much explanation either. *See Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 428 (3d Cir. 2020) (noting, without further explanation, that a robust consensus exists to clearly establish that a hostile work environment claim constitutes a § 1983 violation); *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017) (finding a robust consensus of persuasive authority when seven other circuits recognized a First Amendment right to be free from retaliation in response to filing a prison grievance).

The Fifth Circuit has, however, made clear that the "robust consensus" method does not permit an end-run around the strictures of the controlling-case method. Either way, the law must define the constitutional right "with a high degree of particularity." *Bevill v. Fletcher*, 26 F.4th 270, 279 (5th Cir. 2022); *see also Wyatt*, 718 F.3d at 509 (rejecting robust consensus when the persuasive cases did not clearly establish the right at issue in a particularized sense). The "robust consensus" method thus requires courts to frame the right in terms of the specific circumstances that the officer confronted. It simply allows courts to consider whether other appellate courts have acknowledged that fact-specific right, even if binding authorities have not.

Plaintiffs' approach cannot be squared with these precedents. Plaintiffs try to extrapolate broad legal principles from other excessive-force cases—notwithstanding their distinct facts—and call them a "robust consensus." At oral argument, Plaintiffs referenced over a dozen cases, mostly from this circuit. None of them bears enough factual resemblance to this case to put all officers on notice that Deputy Brewer's use of force was illegal.[4]

In addition, the Court's own research and review of cases from other jurisdictions reveals no consensus of persuasive authority addressing the

---

[4] *See Garner*; 471 U.S. at 11 (fleeing suspect posed no imminent threat); *Darden v. City of Fort Worth*, 880 F.3d 722, 726 (5th Cir. 2018) (chokehold and taser on man with asthma who was struggling against police officers); *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (officer struck an unarmed suspect who was standing next to his car); *Cooper v. Brown*, 844 F.3d 517, 521 (5th Cir. 2016) (affirming denial of qualified immunity where a police dog bit a suspect who was unarmed, not actively fleeing, and not actively resisting); *Ramirez v. Martinez*, 716 F.3d 369, 373 (5th Cir. 2013) (police tasered allegedly non-resisting suspect); *Reyes v. Bridgwater*, 362 F. App'x 403, 404-05 (5th Cir. 2001) (fact dispute over whether armed suspect moved aggressively before shooting); *Flores v. City of Palacios*, 381 F.3d 391, 394-95 (5th Cir. 2004) (officer shot allegedly fleeing car); *Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 626 (9th Cir. 2022) (officer allegedly shot a man six times, without warning, when the man was armed with a bat); *Torres v. City of Madera*, 648 F.3d 1119, 1121, 1123 (9th Cir. 2011) (victim was handcuffed in the back of a police car and then shot by mistake); *Releford v. City of Houston*, 2017 WL 77453 at *1 (S.D. Tex. Feb 29, 2016) (officer, who shot unarmed suspect, provided contradictory testimony about whether he could see suspect's hands); *Khansari v. City of Houston*, 14 F. Supp. 3d 842, 850-51 (S.D. Tex. 2014) (officers tasered unarmed man multiple times after he moved mother to the side to prevent being shot); *see also supra* Part I.A.1 (discussing *Newman*, 703 F.3d at 763-64; *Deville*, 567 F.3d at 167); *supra* Part I.B.1 (discussing *Hobart*, 582 F. App'x at 353-55; *Bazan*, 246 F.3d at 483-84).

The Ninth Circuit's *Estate of Aguirre* decision is further inapposite because it was decided after the incident here. 29 F.4th at 626; *see Ashcroft*, 563 U.S. at 741.

material facts of this case.  The law forecloses this avenue for showing a clearly established right.

### 3.    The constitutional violation here is not "obvious."

Lastly, Plaintiffs argue that the violation here is so egregious that neither controlling authority nor a robust consensus of persuasive authority is required to clearly establish the law.  Dkt. 86 at 16.  The Supreme Court has recognized that no body of relevant case law is necessary if the constitutional violation is "obvious."  *See Brousseau*, 543 U.S. at 199 ("Of course, in an obvious case, [*Graham* and *Garner*] can 'clearly establish' the [law], even without a body of relevant case law.").  The Court did not define what constitutes an "obvious" case.  Logically, though, these instances must be few and limited, lest the exception swallow the otherwise stringent rule.

Unsurprisingly, the Fifth Circuit has seldom found that an officer obviously violated clearly established law.  One example is *Newman v. Guedry*, where a police officer beat and tasered a compliant person who was not suspected of committing a crime and posed no threat.  *See* 703 F.3d at 759; *see also supra* Part I.A.1.  A second instance is *Cole*, where the en banc court declared that police obviously violated *Graham* by shooting a suicidal teenager from behind and without warning.  935 F.3d at 448, 453 ("This case is obvious when we accept the facts as we must.").

A third decision finding an obvious violation was *Graves v. Zachary*, 277 F. App'x 344 (5th Cir. 2008). The plaintiff in *Graves* had threatened to kill himself and shoot his ex-girlfriend. *Id.* at 345. When the police arrived, he was holding a loaded gun to his head. *Id.* Although the plaintiff committed no threatening act toward the police, an officer shot him twice, including once after he was allegedly incapacitated. *Id.* at 345, 348. Evidence also suggested that the officer did not warn the plaintiff to drop his gun before shooting him. *Id.* at 349. On these facts, the Fifth Circuit noted that "it does not take a specific case for an officer to know that he cannot shoot a compliant suspect and that he cannot fire again at someone who is objectively 'downed or incapacitated.'" *Id.*

Under the parameters set in *Newman*, *Cole*, and *Graves*, the circumstances here do not rise to the level of an obvious constitutional violation. This is not a case like *Newman*, where the officer lacked even the remotest justification for beating and tasering a compliant, non-threatening person who had committed no crime. 703 F.3d at 764. Nor is this case like *Cole*, 935 F.3d at 448-49, where the officer failed to warn the suspect before shooting him, or *Graves*, 277 F. App'x at 349, where the suspect was compliant and incapacitated. For over sixteen seconds, Deputy Brewer repeatedly told Mr. Thomas to get on the ground. Dkt. 86-7. Mr. Thomas repeatedly ignored those orders and continued to approach Deputy Brewer despite Brewer's

26

warning that he would shoot.  Dkt. 86-7.  Given that one of the *Graham* factors weighed in Deputy Brewer's favor—namely, Mr. Thomas's resisting arrest—the Court is not convinced that this case is obvious.  *Compare with Roque v. Harvel*, 993 F.3d 325, 339 (5th Cir. 2021) (suggesting that "shoot[ing] an unarmed, incapacitated suspect who is moving away from everyone present at the scene" was "possibly" an obvious case).

In light of these authorities, the fact that a jury could find Deputy Brewer's actions objectively unreasonable does not establish, categorically, that *every* reasonable officer standing in Brewer's shoes would understand that the Fourth Amendment barred using deadly force.  *See Rivas-Villegas*, 142 S. Ct. at 7 ("A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (internal quotation marks omitted).  Tragic as these events were, the Court cannot conclude that Plaintiffs have overcome the daunting hurdle of qualified immunity.  It is therefore recommended that the Court grant Deputy Brewer's summary judgment motion.

II. **Plaintiffs have not raised a genuine issue of material fact on their claims against the County.**

    A. **Plaintiffs' evidence fails to meet the strict requirements for establishing municipal liability under 42 U.S.C. § 1983.**

Rejection of Plaintiffs' claims against Deputy Brewer necessarily forecloses recovery on their corresponding Section 1983 claim against his employer, the County. But even if Plaintiffs' claims against Brewer could survive summary judgment, the law requires more to hold the County liable.

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor ...." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978) (emphasis in original). "Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (footnote omitted).

To recover against a municipality, a plaintiff must demonstrate: (1) that "a deprivation of constitutional rights was inflicted pursuant to an official custom or policy"; (2) that a custom or policy, if facially innocuous, was "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result"; and (3) there is a "direct causal link between the municipal policy and constitutional deprivation." *Id.* at 579-80 (internal quotation marks omitted).

28

Here, Plaintiffs invoke numerous bases for municipal liability: (1) a pattern of excessive force "against African American males and those in medical crisis"; (2) failure to adopt systematic use-of-force reviews and evaluations; (3) failure to equip officers with less-lethal force options; (4) a "pattern of failure to render medical aid"; and (5) failure to properly train the County's officers.  For the reasons explained below, the Court recommends granting the County's motion for summary judgment on these claims.

### 1.   Plaintiffs have not shown a pattern of sufficiently similar excessive-force incidents.

Although Plaintiffs do not claim that the County adopted an explicit policy of using excessive force, municipal liability also can attach to constitutional violations resulting from a "persistent, widespread practice" that "is so common and well settled as to constitute a custom." *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003).  This is a high threshold, however.  The requisite pattern of unconstitutional conduct "requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the *specific violation* in question." *Peterson v. City of Ft. Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (emphasis added; internal quotation marks omitted).

Plaintiffs have not shown a pattern of sufficiently similar and specific conduct based on the twenty-three incidents or governmental reports they cite.

It is therefore recommended that the Court deny as moot both the County's challenges to Plaintiffs' exhibits, *see* Dkt. 93 at 3-4,[5] and Plaintiffs' challenge to the County's expert report, Dkt. 89, and grant summary judgment on Plaintiffs' excessive-force theory.

### i.   Conduct during traffic stops is insufficiently similar to support a pattern or policy.

To substantiate a pattern, Plaintiffs invoke language from a report by the Harris County Justice Administration Department, which found the existence of "some racial/ethnic disparities in rates of arrests, citations, and use of force." Dkt. 87 at 10 & n.48 (quoting Dkt. 87-23, PX22 at 1).  The report itself, however, addresses *traffic stops* of *drivers*.  *See* Dkt. 87-23, PX22 (report to the Commissioners Court entitled "An Evaluation of Harris County Traffic Stop Data in Compliance with the Sandra Bland Act").  Even on that narrow issue, the excerpted portion of the report addresses the broader demographic of both "Black and Hispanic drivers," Dkt. 87 at 10 & nn.49, 50—not just African Americans like Mr. Thomas—while cautioning that the data neither

---

[5] The County challenges the legal relevance of Plaintiffs' exhibits detailing prior incidents.  Dkt. 93 at 3-4 (challenging Dkt. 87-12 to 87-16, PX11-15; Dkt. 87-18 to 87-19, PX17-18; and Dkt. 87-21, PX20).  The County also objects to the admission of two governmental reports, either because Plaintiffs failed to disclose them, or the reports themselves are unreliable.  Dkt. 93 at 4-5 (challenging Dkt. 87-23, PX22 (Harris County Justice Admin. Report); Dkt. 87-24, PX23 (U.S. Department of Justice investigation of conditions at the Harris County Jail)).  Plaintiffs have also challenged the County's expert report as conclusory and legal in nature.  Dkt. 89 at 4-6.  Plaintiffs also complained that the report was unsworn, *id.* at 3-4, but the County mooted that objection by submitting a sworn copy of the report, Dkt. 92 at 3 & DX6 (amended).

"portrays the full characteristics of traffic stops," nor constitutes "prima facia evidence of racial profiling, biased policing, or prejudicial policing."  Dkt. 87-23, PX22 at 1; *see also id.* at 7.

By contrast, Mr. Thomas was not stopped when driving a vehicle.  This incident involved a County deputy who witnessed a pedestrian committing a misdemeanor and confronted him on the street.  *See supra* at 3-4.  Thus, the report's preliminary conclusions are too factually dissimilar from the underlying incident to support an actionable custom or policy.  *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 62-63 (2011) (rejecting reliance on prior *Brady* violations that did not involve "failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind" as "not similar to the violation at issue here"); *Livezey v. City of Malakoff*, 657 F. App'x 274, 278 (5th Cir. 2016) (holding that factual distinctions between prior and challenged traffic stops foreclosed finding a pattern of violations by the same officer).

### ii.   Incidents in the County jail are equally dissimilar.

For much the same reason, Plaintiffs' evidence addressing allegations of excessive force by detention officers *in the County jail*—whether discussed in the Department of Justice Report ("DOJ Report")[6] or in eight other reports

---

[6] Dkt. 87-24, PX23 (U.S. Department of Justice investigation of conditions at the Harris County Jail).

cited in Plaintiffs' chart[7]—fail to show a custom or policy of excessive force in *this* case. Differences between the demands of maintaining security in jails and the challenges of policing the streets necessarily affect the policies developed for each environment. Those differences foreclose inferring that the County adopted a policy for one environment based on its employees' actions in another. Jail-related incidents cannot sustain Plaintiffs' claim. *See Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 809-11 (5th Cir. 2017).

In *Hicks-Fields*, the Fifth Circuit held that the same excessive-force examples detailed in the DOJ Report failed to "resemble—with sufficient similarity—the constitutional violations alleged," even though the alleged

---

[7] *See* Dkt. 87 at 15-16 (citing Dkt. 87-12, PX11 at HC00403, 411 (excessive force by detention officer against inmate Jesus Sepulveda, Jr.); Dkt. 87-14, PX13 at HC00454 (alleged use of force against inmate Casey Schumichael); Dkt. 87-15, PX14 at HC00477 (similar, involving County jail inmate Tony Dwayne Underwood); Dkt. 87-16, PX15 at HC00498-500 (alleged use of force by detention officers against an inmate, Chelsea Caldera); Dkt. 87-21 (sealed), PX20 (detention officer's alleged assault of inmate Francisco Villareal); *Salcido v. Harris Cnty.*, No. 4:15-CV-2155, 2018 WL 6618407 (S.D. Tex. Dec. 18, 2018) (denying summary judgment on claims for death of County jail inmate; *see also id.*, 2018 WL 4690276, at *30-31 (S.D. Tex. Sept. 28, 2018) (prior opinion addressing detention officers' use of excessive force).

In fact, one of Plaintiffs' exhibits addresses a detention officer who was cited for failing to maintain control over an inmate who assaulted *another officer*. Dkt. 87-19, PX18 at HC00531, 536-37. Another report faulted a detention officer for failing to ensure that an inmate received medical aid after he was assaulted by another inmate. Dkt. 87-18, PX17 at HC00522, 525-26. These exhibits have nothing to do with a patrol officer's claimed use of excessive force against a civilian on the street.

Although the County distinguishes another exhibit as a "jail case," Dkt. 91 at 6 (citing Dkt. 87-13 (sealed), PX12 at HC386-402), the report itself addresses a deputy (not a detention officer) who was accused of choking an arrestee at the station, *see* Dkt. 87-13 (sealed), PX12 at HC00386. That exhibit is addressed *infra*, Part II.A.1.iii.& n.13.

violations similarly concerned the use of excessive force in the County jail.  *Id.* at 810-11.  That decision squarely precludes finding that the DOJ Report demonstrates a pattern of excessive force *outside* the County-jail context. Plaintiffs cannot bridge the gap just by claiming that all the incidents, whether in the jail or on the street, involved County employees.  Actions by detention officers cannot render the County liable here.

### iii.   Plaintiffs' remaining examples are inadequately similar.

The County aptly notes that the substantial-similarity requirement makes the remaining fifteen incidents cited by Plaintiffs legally insufficient to demonstrate a tacit custom or policy of excessive force.  Dkt. 66 at 7-11; Dkt. 91 at 3-8.  Plaintiffs fail to acknowledge this defect, much less attempt to address it.  *See* Dkt. 87 at 10, 12-16 (detailing six incidents and including a chart that cites nine incidents outside the County jail setting).

In eight of Plaintiffs' examples, County deputies shot in response to active, potentially lethal aggression.  *See* Dkt. 91 at 4-8.  Three of them involved shootings that followed a suspect's physical struggle with law enforcement.[8]  In another incident, officers executing a search warrant were

---

[8] *See* Dkt. 87-10, PX9 at HC04994 (deputy shot and killed Brian Thornburg, who had overpowered the deputy and crushed him to the ground, impeding the deputy's breathing; a third-party was inadvertently struck by a bullet during the struggle); Dkt. 78-1, DX14 at HC06879, 6909-11, 6915 (deputy shot and killed Marco Antonio Loud after fighting with Loud, sustaining injuries, and deploying his taser); Dkt. 77-3, DX13 at HC0757-58 (during traffic stop, Reginald Williams attempted to drive

fired upon, shot back, and killed the aggressor, but also inadvertently shot a third-party who was sleeping in the house.[9]  Two other incidents involved suspects who threatened to shoot or stab the deputies and refused to drop their weapons.[10]  Two more reports addressed suspects who drove vehicles toward the deputies, threatening their safety.[11]

Tellingly, Plaintiffs present no evidence and cite no case law indicating that these reported incidents constituted excessive force.  Plaintiffs' own expert *negated* their reliance on one of those shootings (Brian Thornburg), by agreeing that the deputy's actions were reasonable.  Dkt. 87-7, PX6 at 47:3-6 ("I don't have any qualms with the actual use of lethal force in that case [involving Thornburg].");  *see also id.* at 48:6-7 ("So I believe the shooting was reasonable ....").  Regardless, the circumstances in the above-referenced reports differ

---

away, dragging the deputy with him; during ensuing physical struggle, the taser was stripped from the deputy's hands, and Williams attempted to climb into the backseat where the deputy believed he had a weapon; the deputy then shot Williams).

[9] *See* Dkt. 76-9, DX9 (news article recounting shooting of third-party Nicholas Solis).

[10] Dkt. 77-4, DX15 (deputy shot Jeray Dilrichard Chatham after he threatened the deputy with a knife, refused to drop it, and charged at the deputy); Dkt. 76-10, DX9 at HC04681, 4683, 4686, 4703 (deputy responding to a call about a suicidal female shot Lucille Espinosa after she displayed a gun, refused to exit the house, threatened to shoot the officers, and pointed her gun at them).

[11] *See* Dkt. 77-1, DX11 at HC06983, 07020 (deputies shot Michael Maldonado after he disobeyed commands to get out of his vehicle and drove the vehicle at them); Dkt. 87-22, PX21 at HC06338-39, 6350-51 (deputy pursued a truck that had rammed a law enforcement vehicle while attempting to escape after a road-rage incident; the deputy stopped the truck when it was pulling into an apartment complex, approached the truck on foot, and fired shots after the truck started backing toward him; Claudia Garcia-Miranda, a passenger in the truck, was struck and killed).

materially from Deputy Brewer's confrontation with Mr. Thomas during a routine street patrol.

Plaintiffs likewise misplace reliance on the pending litigation in *Coucke v. Harris County*, 2020 WL 4569847, at *1-2 (S.D. Tex. Aug. 7, 2020), where a deputy shot a bystander who was not a suspect, had committed no crime, and had not resisted arrest or failed to comply with the deputy's commands. Contrast those facts with this case, where Deputy Brewer witnessed Mr. Thomas committing an offense, and Mr. Thomas continued to approach Deputy Brewer despite Brewer's commands to stop. *See* Dkt. 86-7; Dkt. 86-8 at 20.

The incident involving Jamail Amron, who died after being restrained by deputies from Harris County Constable, Precinct Four, is even further off-point. Dkt. 87 at 12-13 (discussing *Harris County v. Coats*, 607 S.W.3d 359 (Tex. App.—Houston [1st Dist.] 2020, no pet.)). The *Coats* court *reversed* a jury's adverse liability finding because the County lacked final decision-making authority over Precinct Four's use-of-force policies. 607 S.W.3d at 375-78 (reasoning that Precinct Four includes multiple adjoining counties, and only the County sheriff "is a county's final policymaker as to law enforcement for purposes of county liability under section 1983"). Plaintiffs inexplicably ignore the conclusion that the County had no legal responsibility for what happened.

The factual circumstances in this case also differ significantly from *Coats*. There, the officer had used excessive force—not by using a weapon—

35

but by pressing his boot over Amron's nose and mouth while Amron lay motionless and handcuffed on the ground.[12]   607 S.W.3d at 382-83, 385 (affirming jury's finding on this issue).   Unlike the constable in *Coats*, Deputy Brewer employed lethal force from several feet away and did not have physical contact with Mr. Thomas.   *See* Dkt. 86-6; 86-8 at 20.   And Mr. Thomas, unlike Amron, was not in custody; he was advancing toward Deputy Brewer despite repeated commands to stop.   *See* Dkt. 86-6.   These dissimilarities make the Amron incident irrelevant to the analysis.   *See Peterson*, 588 F.3d at 850.

Plaintiffs cite five other instances where *non-lethal* force was used against individuals who were not committing an offense or had allegedly complied with the deputy's directives.[13]   Differences in the underlying facts, alone, render these examples inadequate to show a pattern.   But Plaintiffs also

[12] Despite affirming the finding of excessive force, the *Coats* court ultimately reversed the jury's verdict against the officer for lack of legally sufficient evidence that the use of force caused Amron's death.   607 S.W.3d at 387-90.

[13] Dkt. 87-13, PX12 (sealed) (addressing deputy at police station who allegedly grabbed, shoved, and choked Nathan Marquez for talking back); Dkt. 87-20, PX19 at HC00558-60 (allegations that off-duty deputy "kicked and punched" Ismael Garza after stopping him for reckless driving); *Matthews v. Harris Cnty.*, No. H-18-0014, 2019 WL 2764448, at *2 (S.D. Tex. July 2, 2019) (plaintiff was tased multiple times and kicked in the head, despite following officer's directive to exit the car and remain on the ground); *Cruz v. Delgado*, No. H-16-3568, 2019 WL 8014078, at *1 (S.D. Tex. June 29, 2019) (plaintiff, who had called police, was struck in the face by the responding officer when plaintiff refused to step outside).

Another exhibit discusses a deputy's failure to call for medical attention and report an injury sustained by a *County deputy* who sprained his ankle on the job.   Dkt. 87-17, PX16 (sealed).   That has no relevance to Plaintiffs' excessive-force claim.

cannot complain about prior uses of non-lethal force while maintaining that Deputy Brewer *should have* used non-lethal force toward Mr. Thomas. *See* Dkt. 87 (claiming that the County improperly failed to equip deputies with and train them on use of non-lethal force).

More fundamentally, despite citing fifteen incidents scattered over an eight-year period,[14] Plaintiffs have provided no evidence comparing those claimed instances of excessive force to the total number of arrests or incident calls by County officers during that timeframe. *See* Dkt. 87 at 12-16; *see also* Dkt. 87-7, PX6 at 20:10-14 (Plaintiffs' expert did not know how many arrests the County Sheriff's office made during the five years before Mr. Thomas's death). Nor have Plaintiffs compared the quantity of excessive-force incidents by County deputies to other law enforcement departments of similar size. Without that context, Plaintiffs cannot show that any excessive force was so extant that it constituted an unwritten custom or policy against a particular demographic—including the ones alleged by Plaintiffs. *See Peterson*, 588 F.3d at 851 n.4 (holding 27 incidents of excessive force over a four-year period failed to support municipal liability, "with no context as to the overall number of arrests or any comparisons to other cities"); *see also, e.g., Fuentes v. Nueces*

---

[14] Outside the jail context, the earliest incident was in September 2010, *see Coats*, 607 S.W.3d at 368, and the latest occurred in March 2018, *see* Dkt. 87-10, PX9 (Thornburg incident).

*Cnty.*, 689 F. App'x 775, 778 (5th Cir. 2017) (noting similar failure to adduce evidence comparing rate of asserted suicides in jail to "jails of similar size"). Summary judgment should be granted on Plaintiffs' claim that the County had a policy or custom of using excessive force.

### 2. Plaintiffs fail to show a policy of denying medical care or that any such denial caused Mr. Thomas's injury.

Plaintiffs declare, in conclusory fashion, that the County had a pattern of failing "to render medical aid." Dkt. 87 at 10 (heading of section); *see also id.* at 15 (reprising that reference in the title to a summary chart of "other evidence"). The County maintains that the Fifth Circuit rejects Plaintiffs' "superficial analyses" of these incidents. Dkt. 91 at 8. This Court agrees.

Only three of Plaintiffs' cited exhibits mentions medical care. Two of them involve detention officers—not County patrol deputies. *See* Dkt. 87-18, PX17 at HC00525 (detention officer failed to take inmate Jesus Alvarez to the clinic after he was punched in the eye by another inmate); Dkt. 87-19, PX18 at HC00531, 536-37 (detention officer failed to get medical attention for fellow detention officer). For that reason alone, the two exhibits are insufficiently similar. *See Peterson*, 588 F.3d at 850 (prior incidents must address the "specific violation in question"). The third exhibit does involve a County deputy, but regarding his failure to report *another deputy's on-the-job injury*. Dkt. 87-17 (sealed), PX16 at HC00473-75. These incidents have no bearing on

Plaintiffs' oblique assertion that County deputies denied medical care to someone similarly-situated to Mr. Thomas.   Summary judgment is recommended on Plaintiffs' theory that the County denied medical care.

### 3.    The County's delayed adoption of systematic use-of-force review procedures cannot support recovery.

Plaintiffs also contend that the County failed to conduct systematic reviews and evaluations of existing use-of-force policies, procedures, and practices.  Dkt. 87 at 7-8.  Plaintiffs cite the testimony of County Sheriff Ed Gonzalez, who had undertaken to revamp and improve the County's review process but acknowledged that the County did not create a policy-review unit until 2020—after Mr. Thomas's shooting death occurred.  *Id.* According to Plaintiffs, this eventual implementation of a systematic review process reflects that the County was aware of, and was deliberately indifferent to, the consequences of failing to implement the process sooner.  Dkt. 87 at 17.  Plaintiffs also proffer the testimony of Sergeant DeFoe, a retained expert, *id.* at 17 n.73, who suggested that the County should have addressed Deputy Brewer's "poor tactical decision-making and pre-shooting tactics" by examining its policies and procedures "to ensure incidents like this do not occur in the future," Dkt. 87-5, PX4 at 18.

Even if the County's lack of a systematic use-of-force review process constitutes an actionable policy or custom, Plaintiffs still cannot satisfy the

remaining requirements. One of these hurdles is deliberate indifference. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (2011) (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). This degree of culpability exceeds mere negligence or even gross negligence; "it must amount to an intentional choice, not merely an unintentionally negligent oversight." *James v. Harris Cnty.*, 577 F.3d 612, 617-18 (5th Cir. 2009) (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

Plaintiffs invoke the same prior incidents and reports, discussed above, to show that the County disregarded the need for reviewing its excessive force policies. Dkt. 87 at 17 (incorporating discussion at pp. 10-16). Those prior incidents are materially dissimilar to Deputy Brewer's encounter with Mr. Thomas. *See supra* Part II.A.1. That dissimilarity negates deliberate indifference. *See Shumpert v. City of Tupelo*, 905 F.3d 310, 317 (5th Cir. 2018) (explaining that deliberate indifference typically requires showing "a pattern of similar violations") (internal quotation marks omitted).

Plaintiffs cannot fill their evidentiary gap by citing the testimony of their expert, Mr. DeFoe. As the Fifth Circuit has held, the opinion of Plaintiffs' expert "should not be alone sufficient to establish constitutional 'fault' by [the County], when "no facts support the interference that the [County's] motives

were contrary to constitutional standards." *See Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998) (internal quotation marks omitted); *see also Connor v. Travis Cnty.*, 209 F.3d 794, 798 (5th Cir. 2000) ("[P]laintiffs generally cannot show deliberate indifference through the opinion of only a single expert ….").

In addition, Plaintiffs have not shown that any failure to implement a process for reviewing the County's force-review policies caused the incident. Municipal liability requires that an official policy be "the moving force behind the constitutional violation." *James*, 577 F.3d at 617; *see also* Dkt. 66 at 12-13 (County's challenge to causation). "In other words, a plaintiff must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." *James*, 577 F.3d at 617 (citing *Piotrowski*, 237 F.3d at 580). "These requirements must not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (quoting *Brown*, 520 U.S. at 415).

The notion that a hypothetical review process would have prevented Mr. Thomas's death requires a series of inferences for which Plaintiffs offer no proof. The Court would need to conclude that a review process would have led to certain changes in the use-of-force policies, and that those changes would have altered Deputy Brewer's actions. But Plaintiffs do not identify any policy changes that emerged from the new review process, much less attempt to show

a "causal link" between those unspecified changes and what ultimately transpired. *See James*, 577 F.3d at 617; *see also Estate of Bonilla v. Orange Cnty.*, 982 F.3d 298, 311 (5th Cir. 2020) (affirming summary judgment for county when "[a] jury would have to resort to impermissible speculation to conclude that there was a 'direct causal link' between the alleged constitutional violation ... and [Bonilla's] death").

Notably, both the County and Plaintiffs maintain that Deputy Brewer violated the County's *existing* policies and procedures on use of force—and was terminated as a result. *See* Dkt. 66 at 12 (County "agreed" that Deputy Brewer violated HCSO policies and fired him); Dkt. 66-4, DX3 at HC0069 (Brewer's termination letter); Dkt. 86 at 11-12 (Plaintiffs' response to Brewer's motion for summary judgment). This leaves no reason to think that Deputy Brewer would have acted differently if the County had implemented a new system for *reviewing* the very same policies that already were in place, but that Brewer disregarded. The lack of causation evidence merits summary judgment.

### 4.    Uncontroverted evidence shows that the County did equip officers with less-lethal force options.

Plaintiffs' theory that the County unlawfully failed to provide deputies with less-lethal force options is equally deficient. There is no dispute that Deputy Brewer was issued a taser, a non-lethal option. Dkt. 87-4, DX3 (sealed) at HC00250 (Internal Affairs Division Report containing Deputy Brewer's

voluntary statement); Dkt. 87 at 3 & n.23 (Plaintiffs' citation to Brewer's testimony).  Brewer just chose not to use the taser before drawing and firing his gun at Mr. Thomas.  Dkt. 87-4, DX3 (sealed) at HC00249-53.  Under these circumstances, Plaintiffs' theory that Brewer would have used other, alternative devices like a baton, pepper spray, or beanbag shotgun, is purely speculative.  *See* Dkt. 87-7, PX6 at 44:1-45:23 (DaFoe deposition); *Estate of Bonilla*, 982 F.3d at 311 (rejecting "resort to impermissible speculation" about causation).  Regardless of whether the County's decision not to provide those alternative devices amounts to a custom or policy, Plaintiffs failed to show that any such custom or policy was a moving force behind Mr. Thomas's death.

### 5. Plaintiffs fail to show that the County failed to train its officers.

Plaintiffs' final municipal-liability theory alleges that the County had a custom or policy of failing to properly train its officers.  Dkt. 87 at 19-24.  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of Section 1983."  *Connick*, 563 U.S. at 61.  But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id.* (citing *Okla. City v. Tuttle*, 471 U.S. 808, 822-23 (1985)).  "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability

on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390-91 (1989). "And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Id.* at 391. Permitting failure-to-train cases to move forward on a "lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result [the Supreme Court] rejected in *Monell*." *Id.* (citing *Monell*, 436 U.S. at 693-94).

To support their failure-to-train theory, Plaintiffs rely heavily on the report of their expert, Mr. DeFoe, who opined that Deputy Brewer's conduct reflects a lack of adequate training. Dkt. 87 at 19-21 (citing Dkt. 87-5, PX4 (expert report); 87-6, PX5 (supplemental report); 87-7, PX6 (deposition excerpts)). The Supreme Court, however, has stressed that an actionable custom or policy generally must "apply over time to multiple employees." *Brown*, 117 S. Ct. at 407 (discussing *City of Canton*, 489 U.S. at 390). Under that principle, an actionable claim for failure to train must identify systemic training inadequacies that extend beyond the instant case. Nothing in Mr. DeFoe's report meets that threshold.

Mr. DeFoe claimed that the prior incidents discussed above reflected "parallel" training deficiencies to Deputy Brewer's. Dkt. 87-7, PX6 at 101:23-102:6-16. As already concluded, however, those incidents are insufficiently

44

similar to Brewer's confrontation with Mr. Thomas to establish a cognizable pattern. *See supra* Part II.A.1. To extrapolate inadequate training solely from Brewer's actions would impose *respondeat superior* liability on the County—a result that the Supreme Court forbids. *See City of Canton*, 489 U.S. at 391; *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) ("[W]e have held that proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training.").

Another defect concerns Plaintiffs' lack of evidence that the County was deliberately indifferent to Brewer's training. For instance, Plaintiffs assert that Brewer should have received use-of-force training on an annual basis, as County policy requires, and should have received more taser training, too. Dkt. 87 at 21-22; *see also* Dkt. 87-7, PX6 at 34:1-35:14, 95:18-96:24. Plaintiffs also cite Brewer's confusion over what the County's use-of-force policy permitted. Dkt. 87 at 21 (citing Dkt. 87-11, PX10 at 52:13-22, 54:18). But there is no evidence that these purported training omissions were part of a larger pattern throughout the County Sheriff's department. *See Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employee is ordinarily necessary to demonstrate deliberate indifference for purpose of failure to train.") (internal quotation marks omitted).

Moreover, the Fifth Circuit has generally required that a municipality "provide[ ] no training whatsoever" to sustain a failure-to-train claim based on

a single incident. *Hutcheson v. Dallas Cnyt.*, 994 F.3d 477, 483 (5th Cir. 2021) (quoting *Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018), and affirming dismissal of failure-to-train claim where "[t]he county ... provided at least some relevant directives or training to its officers"). That is far from the case here. Undisputed evidence shows that Brewer *did* receive training on the County's use-of-force continuum, as well as the use of tasers and other non-lethal defense tactics. *See* Dkt. 76-7, DX7 at HC2641; Dkt. 77-6, DX17 at HC02604-05 (County's use-of-force policy); Dkt. 76-2, DX2 at 44:7-16, 47:19-21, 49:13-52:12. Uncontroverted evidence also shows that Brewer's training regimen comports with state-law requirements, Dkt. 76 at 12-13; Dkt. 87 at 21-22 (Plaintiffs not disputing this point)—a factor that further "counsel[s] against a failure to train finding," *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 171 (5th Cir. 2010) (internal quotation marks omitted).

Merely claiming that "an injury or accident could have been avoided if [Brewer] had had better or more training" does not equate to an unconstitutional failure to train. *City of Canton*, 489 U.S. at 391. On this record, "the totality of the evidence does not even approach the *City of Canton* standard: that the inadequacy be 'so obvious' and 'so likely to result in the violation of constitutional rights' that the [County] can be said to have been deliberately indifferent." *Snyder*, 142 F.3d at 799 (quoting *City of Canton*, 489 U.S. at 390); *id.* (reversing jury's liability finding against the City of New

Orleans, when no evidence showed the city was aware of its officers' supposedly high stress levels that allegedly caused an officer to shoot a fleeing individual); *see also Pena*, 879 F.3d at 624 (noting that the single-incident exception to demanding a pattern of training deficiencies "is generally reserved for those cases in which the government actor provided no training whatsoever"). Summary judgment on Plaintiffs' failure-to-train theory is recommended.

### B.   Plaintiffs failed to raise a fact question on their claim under the Americans with Disabilities Act.

In the alternative, Plaintiffs assert that the County violated the Americans with Disabilities Act ("ADA") when Deputy Brewer used excessive force against Mr. Thomas.  Dkt. 87 at 24-25.  The parties debate the scope of the decision in *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000), which recognized that officers need not "factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians." Under that exception, ADA claims cannot be premised on "an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Id*.

Subsequent applications of *Hainze* have reached different conclusions, depending on whether there was evidence that the individual posed a threat.

*Compare, e.g.*, *Jackson v. Harris Cnty.*, Civil Action No. H-17-3885, 2020 WL 973387, at *8 (S.D. Tex. Feb. 26, 2020) (noting "disputed facts as to exigency" of the incident, but granting summary judgment to defendant on other grounds), *and Sullivan v. City of Round Rock*, No. A-14-CV-349-AWA, 2017 WL 4001572, at *1 (W.D. Tex. Sept. 11, 2017) (noting prior denial of summary judgment on ADA claim because of "fact questions surrounding whether Sullivan posed a threat or whether there was any need for officers to secure the scene") (internal quotation marks omitted), *with Munroe v. City of Austin*, 300 F. Supp. 3d 915, 931-32 (W.D. Tex. 2018) (applying *Hainze* and dismissing ADA claim that the city failed to accommodate decedent's alleged mental disability because decedent's possession of a BB gun could have caused officers to believe they had not secured the scene).   The evidence here, viewed in the light most favorable to Plaintiffs, suggests that Mr. Thomas, while perhaps not an imminent threat, was not secured before Deputy Brewer employed lethal force.   *See supra* Part I.A.2.   Arguably, that triggers the exigent-circumstances exception in *Hainze* and forecloses Plaintiffs' ADA claim.

Regardless, all ADA claims require a *prima facie* showing of disability discrimination.   As the County notes, Dkt. 91 at 11, a plaintiff must show: "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise

being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability," *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004).

The first element requires Plaintiffs to demonstrate that Mr. Thomas had a qualifying disability, which the ADA defines as "(A) a physical or mental impairment that substantially limits one or more major life activities … ; (B) a record of such an impairment; or (C) being regarded as having such an impairment," which is shown by "establish[ing] that [Mr. Thomas] has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *See* 42 U.S.C. § 12102(1), (3). Plaintiffs have not substantiated any of these alternatives.

At most, Plaintiffs assert that Mr. Thomas was determined to be a "Danger to Self" during a single prior incident (June 5, 2017), and that his erratic behavior on March 22, 2018, should have led a "reasonable law enforcement officer" to conclude that Mr. Thomas "was mentally ill, experiencing a mental crisis, and or under the influence of a controlled substance." Dkt. 87 at 25 (quoting Dkt. 87-5, PX4 at 8-9 (DeFoe Report); Dkt. 87-6, PX5 at 8 (DeFoe Supplemental Report)). These conclusory assertions are insufficient to meet Plaintiffs' burden to establish that Mr. Thomas has a qualifying disability under the ADA.

In addition, the second and third elements require proof that Mr. Thomas was excluded from participation in, or denied benefits of, services, programs, or activities for which the County is responsible, or was otherwise discriminated against by the County because of his disability. *See Melton*, 391 F.3d at 671-72. "A critical component" of the ADA claim "is proof that the disability and its consequential limitations were known by the entity providing public services." *Windham v. Harris Cnty.*, 875 F.3d 229, 236 (5th Cir. 2017) (internal quotation marks and alteration omitted); *see also Smith v. Harris Cnty.*, 956 F.3d 311, 319 (5th Cir. 2020) ("In the context of a failure-to-accommodate claim, intentional discrimination requires at least actual knowledge that an accommodation is necessary."). Because Mr. Thomas did not directly request a specific accommodation, Plaintiffs must demonstrate that "the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents." *Windham*, 875 F.3d at 237 (internal quotation marks omitted).

Plaintiffs have not substantiated that Mr. Thomas's limitations and how to reasonably accommodate them were open or obvious. Although Mr. Thomas's behavior—hitting a car with his hands, staring blankly, and walking with his pants around his ankles—was certainly abnormal, even Plaintiffs' own expert offered several alternative explanations for Mr. Thomas's conduct. *See* Dkt. 87-6, PX5 at 9 (suggesting that Mr. Thomas was "mentally ill,

experiencing a mental crisis, *and or* under the influence of a controlled substance" (emphasis added)).   In fact, the autopsy report reflects that Mr. Thomas had PCP in his system.   Dkt. 70 at HC00319 (sealed).   Current use of illegal drugs would exclude Mr. Thomas from the ADA's protections.   *See* 28 C.F.R. § 35.104 ("The term individual with a disability does not include an individual who is currently engaging in the illegal use of drugs, when the public entity acts on the basis of such use.").

Plaintiffs have not raised a genuine issue of material fact on their ADA claim.   Summary judgment on this claim is therefore recommended.

## Recommendation

It is therefore **RECOMMENDED** that the Court **GRANT** Defendant Cameron Brewer's motion for summary judgment (Dkt. 71), **GRANT** Defendant Harris County's amended motion for summary judgment (Dkt. 76), and enter a take-nothing judgment on all of Plaintiffs' claims.   It is further **RECOMMENDED** that the Court **DENY** as moot both Defendant Harris County's motion to strike evidence (Dkt. 93) and Plaintiffs' amended objections to Harris County's evidence (Dkt. 89).

**The parties have fourteen days from service of this Report and Recommendation to file written objections.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).   Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for**

plain error.  *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).

Signed on May 26, 2022, at Houston, Texas.

_____

Yvonne Y. Ho
United States Magistrate Judge